## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | : | Case No. 14-10979 (CSS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| ENERGY FUTURE HOLDINGS CORP., | : | |
| | : | |
| Plaintiff, | : | Adv. Pro. No. 15-51386 (CSS) |
| v. | : | |
| | : | |
| TEXAS TRANSMISSION INVESTMENT LLC, | : | |
| | : | |
| Defendant. | : | |
| OVATION ACQUISITION I, L.L.C. and | : | |
| OVATION ACQUISITION II, L.L.C., | : | |
| | : | |
| Intervenor | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| TEXAS TRANSMISSION INVESTMENT LLC, | : | |
| | : | |
| Defendant. | : | |

## TEXAS TRANSMISSION INVESTMENT LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

George A. Zimmerman
Jason C. Vigna
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Jason M. Liberi (I.D. No. 4425)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Tel.: (302) 651-3000

George N. Panagakis
Carl T. Tullson
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606

*Attorneys for Defendant Texas Transmission Investment LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

PRELIMINARY STATEMENT ..................................................................................................... 1

UNDISPUTED FACTS .............................................................................................................. 10

    A.    Oncor's Ownership Structure .............................................................................. 10

    B.    Oncor's Investor Rights Agreement ..................................................................... 11

            1.    The Negotiations Leading up to the Execution of the IRA ...................... 12

            2.    Any "IPO Conversion" Approved by Oncor's Board Requires Granting TTI the Right To Receive Shares in the "IPO Corporation" ........................................................................................... 13

            3.    The IRA's Drag-Along Provision ............................................................. 13

            4.    TTI Negotiated To Broaden the IRA's Tag-Along Provision.................... 16

    C.    The EFH Bankruptcy Plan and Merger Agreement.............................................. 17

            1.    The T-Side Spin ........................................................................................ 17

            2.    OV1's Merger with Reorganized EFH ...................................................... 17

            3.    The REIT Conversion Steps ..................................................................... 18

    D.    EFH's Purported "Required Sale Notice" ............................................................. 19

ARGUMENT.............................................................................................................................. 20

I.    LEGAL STANDARDS ....................................................................................................... 20

    A.    Summary Judgment Should Be Entered Where There Is No Genuine Issue of Material Fact............................................................................................ 20

    B.    Summary Judgment Should Be Granted Where EFH's Evidence Is Insufficient To Prove an Essential Element of Its Claim...................................... 21

    C.    All Contractual Conditions for Exercising a Drag Right Must Be Satisfied............................................................................................................... 21

    D.    Because the IRA Is Unambiguous, a Purely Legal Question Is Presented............................................................................................................. 21

E.    In the Alternative, If the Court Finds the Agreement Ambiguous, Extrinsic Proofs, Including Industry Custom, May Be Examined To Resolve the Ambiguity ......................................................................... 23

II.    NONE OF THE THREE REQUIREMENTS TO COMPEL A DRAG SALE PURSUANT TO SECTION 3.3 OF THE INVESTOR RIGHTS AGREEMENT HAS BEEN SATISFIED ......................................................... 23

A.    OV1 Has Not Made a Valid Offer To Purchase Oncor LLC Units or IPO Units from Each Member ............................................................. 24

1.    OV1 Has Not Offered To Purchase IPO Units from EFH ........................ 24

2.    OV1 Has Not Offered To Purchase LLC Units from EFH ........................ 25

(a)    An Offer To Merge with a Company Is Neither Semantically Nor Legally an Offer to Purchase Assets Held by That Company ....................................................... 26

(b)    An Offer To Transfer LLC Units Indirectly by Acquiring Equity Interests in a Subsidiary of EFH the Sole or Principal Asset of Which Is Such LLC Units Is Not an Offer To Purchase LLC Units Held Indirectly by EFH ......................................................... 28

B.    OV1 Has Not Offered Each Member the Same Type and Amount of Consideration ............................................................................................. 30

C.    No Requisite "Change of Control" Will Occur....................................... 34

III.    TTI HAS NO DUTY TO COOPERATE WITH OV1'S PROPOSED IPO, BUT HAS DONE NOTHING TO INTERFERE WITH IT ............................................. 36

IV.    EFH'S MISREADING OF THE INVESTOR RIGHTS AGREEMENT FRUSTRATES, RATHER THAN ADVANCES, THE PARTIES' REASONABLE EXPECTATIONS ................................................................. 37

CONCLUSION ................................................................................................. 40

# TABLE OF AUTHORITIES

## CASES

Advanced Video Technologies, LLC v. HTC Corp.,
  103 F. Supp. 3d 409 (S.D.N.Y. 2015)....................................................................4, 27

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986)..............................................................................................20

Celotex v. Catrett,
  477 U.S. 317 (1986)..............................................................................................20

Clearmont Property, LLC v. Eisner,
  872 N.Y.S.2d 725 (App. Div. 2009).......................................................................21

Credit Suisse Securities (USA) LLC v. West Coast Opportunity Fund, LLC,
  No. Civ.A. 4830-VCN, 2009 WL 2356881 (Del. Ch. July 30, 2009) ........................4

Dawson v. Pittco Capital Partners, L.P.,
  C.A. No. 3148-VCN, 2012 WL 1564805 (Del. Ch. Apr. 30, 2012)........................21

Ellington v. EMI Music, Inc.,
  21 N.E.3d 1000 (N.Y. 2014)..................................................................................26

In re Energy Future Holdings Corp.,
  539 B.R. 723 (Bankr. D. Del. 2015).......................................................................22

Engel v. Teleprompter Corp.,
  703 F.2d 127 (5th Cir. 1983) .................................................................................27

ERC 16W Limited Partnership v Xanadu Mezz Holdings LLC,
  943 N.Y.S.2d 493 (App. Div. 2012).......................................................................38

Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Company of New
  York,
  375 F.3d 168 (2d Cir. 2004)...................................................................................22

Fisher Scientific International Inc. v. Modrovich,
  No. H-03-0467, Mem. Op. (S.D. Tex. Aug. 30, 2004)......................................23, 31

Fisher Scientific International Inc. v. Modrovich,
  No. H-03-0467, Mem. Op. (S.D. Tex. Sept. 8, 2004).............................................24

Foulk v. Donjon Marine Co.,
  144 F.3d 252 (3d Cir. 1998)...................................................................................21

GPIF-I Equity Co. v. HDG Mansur Investment Services, Inc.,
    No. 13 Civ. 547(CM), 2013 WL 3989041 (S.D.N.Y. Aug. 1, 2013) ..................... 30

Greenfield v. Philles Records, Inc.,
    780 N.E.2d 166 (N.Y. 2002) ................................................................ 22, 32

Gustafson v. Alloyd Co.,
    513 U.S. 561 (1995) ........................................................................... 8, 32

Halpin v. Riverstone National, Inc.,
    C.A. No. 9796-VCG, 2015 WL 854724 (Del. Ch. Feb. 26, 2015) ................... 22, 26

Hoag v. Chancellor, Inc.,
    677 N.Y.S.2d 531 (App. Div. 1998) ........................................................... 23

Israel v. Chabra,
    537 F.3d 86, 99 (2d Cir. 2008) ................................................................... 6

Maysek & Moran, Inc. v. S.G. Warburg & Co.,
    726 N.Y.S.2d 546 (App. Div. 2001) ........................................................... 23

In re Opus East, L.L.C.,
    480 B.R. 561 (Bankr. D. Del. 2012) .................................................... 4, 5, 27

Owl Fumigating Corp. v. California Cyanide Co.,
    24 F.2d 718 (D. Del. 1928), aff'd, 30 F.2d 812 (3d Cir. 1929) ........................ 4, 27

In re Piece Goods Shops Co.,
    188 B.R. 778 (Bankr. M.D.N.C. 1995) ....................................................... 23

Quadrant Structured Products Co. v. Vertin,
    16 N.E.3d (N.Y. 2014) ........................................................................... 30

Reyes v. Metromedia Software, Inc.,
    840 F. Supp. 2d 752 (S.D.N.Y. 2012) ................................................... 22, 23

Telenor Mobile Communications v. Storm LLC,
    587 F. Supp. 2d 594 (S.D.N.Y. 2008) ........................................................ 32

VKK Corp. v. National Football League,
    244 F.3d 114 (2d Cir. 2001) ..................................................................... 22

W.W.W. Associates, Inc. v. Giancontieri,
    566 N.E.2d 639 (N.Y. 1990) .................................................................... 22

## STATUTES

Del. Code Ann. Tit. 6, § 18-701 ...................................................................... 5, 27

## RULES

Fed. R. Civ. P. 56(c) ................................................................................................21

Fed. R. Bankr. P. 7056 .........................................................................................1, 20

D. Del. Bankr. L.R. 7012-1 ........................................................................................1

## OTHER AUTHORITIES

Victoria A. Braucher, 6A Fletcher Cyclopedia of the Law of Corporations § 2843
(1997) ......................................................................................................................29

Defendant Texas Transmission Investment LLC ("TTI") respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, made applicable here by Bankruptcy Rule 7056.[1]

## PRELIMINARY STATEMENT

This Court will recall that it denied TTI's motion to dismiss with the following observation:

> This is a complicated contract and the problem with looking at a complicated contract is looking at all the provisions as a whole and coming up with a reasonable interpretation. And it may be that at the end of the day, . . . that when I do that, I may rule on behalf of the defendants.[2]

TTI respectfully submits that after one month of intense expedited discovery, this Court should conclude that day has come. The evidentiary record – including the plain language of the Investor Rights Agreement ("IRA") of Oncor Electric Delivery Company LLC ("Oncor"), the drafting history of the IRA, the testimony of Energy Future Holdings Corp.'s ("EFH's") lead negotiators and the testimony of the architect of Ovation Acquisiton I, L.L.C.'s ("OV1's") acquisition proposal (the "Transaction") – convincingly establishes the following propositions as a matter of law:

**1.    TTI's reading of the terms of the Drag Provision, § 3.3 of the IRA, is the only reading that comports with its clear, unambiguous terms**

Section 3.3 of the IRA provides that a right to drag TTI is triggered only if, among other things: (i) "EFH . . . receives an offer to purchase . . . a number of [Oncor] LLC Units or IPO Units, as the case may be, held directly or indirectly by [EFH]" (IRA (Ex. 1)

---

[1]    TTI does not consent to entry of final judgments and orders in this proceeding and disputes that this is a "core" proceeding. <u>See</u> Del. Bankr. L.R. 7012-1.

[2]    (D.I.48 (Transcript of Argument on Def.'s Mot. To Dismiss, Dec. 18, 2015), at 55-56.)

§3.3(a));[3] and (ii) each "Member" of Oncor "receive[s] the same type and amount of consideration . . . at the same time, on a per Drag Unit basis[.]" (Id. § 3.3(d)(i).) It is undisputed that there currently are no IPO Units,[4] and if and when they ever come into existence, EFH will never hold them, directly or indirectly. (See Baker Dep.[5] (Ex. 2) 104:20-22, 105:21-25, 107:20-23, 109:25-110:15; Horton Dep. (Ex. 3) 251:1-5, 276:9-12.) Therefore, as EFH has not received, and cannot receive, an offer to purchase IPO Units, the Drag can only be triggered by an offer to purchase Oncor LLC Units held directly or indirectly by EFH.

No one disputes that Oncor's LLC Units are owned and held by Oncor Electric Delivery Holdings LLC ("Oncor Holdings") (80.03%), TTI (19.75%) and members of Oncor's management team ("Oncor Management") (.22%). (See, e.g., D.I.1 (Compl. ¶¶ 19, 28, 29).) It also is undisputable that Oncor Holdings' LLC Units will *not* be purchased in the Transaction. As both OV1's and EFH's lead negotiators conceded at deposition, Oncor Holdings will continue to own its 80.03% of the Oncor LLC Units after the Transaction is completed. (Baker Dep. (Ex. 2) 66:2-68:4, 76:6-21; Horton Dep. (Ex. 3) 277:7-19.) As

---

[3]   To trigger the drag-along rights set forth in § 3.3 of the IRA (the "Drag"), such offer to purchase must also result in a "Change of Control." As explained herein, that will not occur under the Transaction as currently structured.

References to "Ex. __ " are to exhibits to the accompanying transmittal declaration of Jason Liberi.

[4]   As discussed within, equity interests in an "IPO Corporation" are "IPO Units." (IRA (Ex. 1) at 37.) Plaintiff EFH and Intervenor-Plaintiffs OV1 and Ovation Acquisition II, L.L.C. ("OV2" and, together, "Ovation") contend that OV1 is an IPO Corporation. (See, e.g., Horton Dep. (Ex. 3) 275:2-4.) EFH and Ovation are referred to collectively as "Plaintiffs."

[5]   References to "Baker Dep.," "Horton Dep.," "Wilks Dep." and "Zucchet Dep." are to the deposition transcripts of W. Kirk Baker, Greg Wilks, Anthony Horton and Steven Zucchet, respectively, attached as Exhibits 2, 3, 4, and 5 to the accompanying transmittal declaration of Jason Liberi.

2

Oncor Holdings clearly is *not selling* its LLC Units in the Transaction, it necessarily follows that OV1 is *not purchasing* them. Therefore, there will *not* be a "purchase" of "[Oncor] LLC Units" – *regardless* of whether they are "held directly or indirectly" by EFH. (IRA (Ex. 1) § 3.3(a).) Consequently, the Drag cannot be triggered.

It also necessarily follows from this that the Transaction cannot meet a second and independent condition precedent to triggering the Drag, namely that "each of the Members shall receive the same type and amount of consideration . . . at the same time, on a per Drag Unit basis[.]" (IRA (Ex. 1) § 3.3(d)(i).) EFH and OV1 concede that: (i) Oncor Holdings is a "Member" of Oncor; and (ii) Oncor Holdings will not receive any consideration in the Transaction[6] – which is not surprising because Oncor Holdings is not selling its Oncor LLC Units.[7] As it is undisputed that "Member" Oncor Holdings and "Member" TTI will not "receive the same type and amount of consideration" for their Oncor LLC Units, § 3.3(d)(i) cannot be satisfied.

### 2. TTI's reading of the terms of the Drag Provision, § 3.3 of the IRA, is the only reading that reconciles all relevant provisions of the IRA; in contrast, EFH's strained reading creates an irreconcilable conflict with the IPO Conversion Provision, §3.7 of the IRA

The textual basis of EFH's contrary reading of § 3.3(a) rests heavily upon the phrase "[Oncor] LLC Units . . . held directly or indirectly by [EFH]." According to EFH, it owns 100% of the interests in Energy Futures Intermediate Holding Company LLC

---

[6] (See D.I.31 (Plaintiff Energy Future Holdings Corp.'s Mem. of Law in Opp'n to Def. Texas Transmission Investment LLC's Mot. To Dismiss) at 15, n.9; Energy Future Holdings Resps. & Objs. to Def. Texas Transmission Investment LLC's First Set of Interrogs. ("EFH Irog. Responses") (Ex. 6) No. 8; Intervenor Pls.' Ovation Acquisition I, L.L.C. & Ovation Acqustion II, L.L.C.'s Objs. & Resps. to Def. Texas Transmission Investment LLC's First Set of Interrogs. ("Ovation Irog. Responses") (Ex. 7) Nos. 4 & Ex. B.)

[7] (See EFH Irog. Responses (Ex. 6) No. 1; Horton Dep. (Ex. 3) 277:13-19.)

("EFIH"), which in turn owns 100% of the interests in Oncor Holdings, which in turn owns 80.03% of the Oncor LLC Units. As EFH would have it, because OV1 is offering to purchase all of the *shares* of EFH from EFH's parent, and EFH indirectly owns Oncor Holdings (whose asset is the Oncor LLC Units), OV1 therefore is offering to purchase the LLC Units "held indirectly" by EFH.

EFH's strained reading proves too much. First, as established above, Oncor Holdings is not selling its Oncor LLC Units. As there will be no sale of those LLC Units, there also can be no purchase of those LLC Units. Therefore, *even if* EFH indirectly holds those LLC Units, that has no import here because the LLC Units are not being purchased.

Second, EFH's reading violates a fundamental rule of Delaware (and universal) corporate law – namely, the purchaser of the equity of a corporation does *not* acquire that corporation's assets: "The general rule of law is well settled that ownership alone, of capital stock in one corporation by another, does not . . . render the stockholding company the owner of the property of the other." Owl Fumigating Corp. v. Cal. Cyanide Co., 24 F.2d 718, 719 (D. Del. 1928); aff'd, 30 F.2d 812 (3d Cir. 1929); accord Advanced Video Techs., LLC v. HTC Corp., 103 F. Supp. 3d 409, 419 (S.D.N.Y. 2015) ("[The purchaser] did not acquire any of [the corporation's] assets simply by purchasing 100% of its stock. That is a well-settled proposition of corporate law[.]").

That rule squarely applies here. Oncor Holdings is, and was in 2008, a Delaware LLC. "The Delaware Legislature clearly intended to extend this maxim to limited liability companies." In re Opus E., L.L.C., 480 B.R. 561, 575 (Bankr. D. Del. 2012).[8] Indeed, the

---

[8] See also Credit Suisse Secs. (USA) LLC v. W. Coast Opportunity Fund, LLC, No. CIV.A. 4380-VCN, 2009 WL 2356881, at *3 (Del. Ch. July 30, 2009) (holding that the member of a Delaware LLC did not own the stock in question, which was "entirely the
*(cont'd)*

Delaware Limited Liability Company Act could not be clearer on this point.  See Del. Code Ann. Tit. 6, § 18-701 ("A member has *no interest* in specific limited liability company property." (Emphasis added.)).  Therefore, EFH's indirect ownership of 100% of the equity of Oncor Holdings does not "render [it] the owner of the property of [Oncor Holdings]."  Owl Fumigating Corp., 24 F.2d at 719.  It follows that OV1's  purchase of EFH's shares is *not* the purchase of the property of  Oncor Holdings, namely the LLC Units.

Third, EFH's tortured reading of the drag right pits that provision squarely in conflict with the IPO Conversion section of the IRA.  EFH insists in this litigation that the Transaction involves an IPO Conversion, as defined in IRA §3.7, that will result in the creation of an IPO Corporation (OV1) for the express purpose of an initial offering of securities of OV1 for sale to the public in an IPO.[9]  (See D.I.1 (Compl. ¶ 6); Horton Dep. (Ex. 3) 228:9-230:23.)  But, under the clear and unambiguous terms of § 3.7, TTI must be permitted to fully participate in any such IPO Conversion:

> In connection therewith, . . . the Company and each Member agree to cooperate with the other Members in good faith in order to effectuate the IPO Conversion . . . *and ensure that each Member receives shares of common stock . . . or the right to receive shares of common stock . . . and other rights in connection with such IPO Conversion substantially equivalent to, and in exchange for, its economic interest, governance, priority and other rights and privileges as such Member had with respect to its LLC Units prior to such IPO Conversion . . . .*

---

*(cont'd from previous page)*

property of [the LLC] and [member's] status as a member [of LLC] does not alter this fact").

[9]  As set forth in Section III, below, there is no IPO Conversion in process at this time and, therefore, TTI's alleged failure to cooperate with the IPO Conversion fails to state a claim as a matter of  law.  However, for present purposes, we assume that an IPO Conversion is in play to highlight the irreconcilable conflict that EFH's thesis raises with the plain meaning of Section 3.3.

(IRA (Ex. 1 § 3.7(a) (emphasis added).)

It is undisputed that TTI is not being offered the right to participate in any alleged IPO Conversion. Both OV1's and EFH's lead negotiators conceded that point in their sworn testimony. (Baker Dep. (Ex. 2) 34:18-23; Horton Dep. (Ex. 3) 269:4-6.) Indeed, *by definition*, TTI could not have the right to participate in an IPO Conversion if, as EFH now maintains, that same IPO Conversion triggered the Drag. Thus, while TTI's reading of § 3.3 renders it consistent with § 3.7, EFH's strained reading of § 3.3 pits it squarely in conflict with § 3.7. As a matter of fundamental contract law, such a result is to be avoided at all costs. See, e.g., Israel v. Chabra, 537 F.3d 86, 99 (2d Cir. 2008) ("If we can construe the two provisions in a way that renders both operative and compatible, we must do so."), certified question answered, 906 N.E.2d 374 (N.Y. 2009).

The wisdom of this deep-rooted rule of contract construction is borne out by the testimony in this case. When confronted with this direct contradiction of §§ 3.3 and 3.7 resulting from EFH's theory of the case, its chief negotiator glibly responded that "from a business perspective, the drag trumps those [§ 3.7] rights." (Horton Dep. (Ex. 3) at 299:8-9.) Needless to say, the IRA contains no language prioritizing § 3.3 over § 3.7, and in the absence of such language, there is no known rule of contract construction that empowers one party to a contract to declare unilaterally that its favored provision "trumps" another. Moreover, no such facile rule need be created here as TTI's reading of the IRA – and only TTI's reading – perfectly reconciles these provisions, thus eliminating the need to artificially subordinate one portion of the contract to the other at the whim of either party.

As set forth below, the Drag also is not triggered because of the failure to satisfy a third, independent condition precedent, namely, that the Transaction result in a "Change of

6

Control" as defined in the IRA. In this connection, EFH has inexplicably refused to identify where it believes the "Change of Control" needs to occur. (Horton Dep. (Ex. 3) 278:19-290:24.) No matter. EFH and OV1's lead representatives testified that Oncor Holdings now holds, and will continue to hold, at least 80% of the Oncor LLC Units (Baker Dep. (Ex. 2) 71:4-9' 76:13-79:22; Wilks Dep. (Ex. 4) 182:8-185:25) and the current owners of OV1 will continue to own 98% of OV1 (the entity plaintiffs identify as the "IPO Corporation" for purposes of the IRA) following the Transaction and OV1 IPO. (Baker Dep. (Ex. 2) 140:6-141:13.) Therefore, there will be no "Change of Control" at any conceivably relevant level.

### 3. The undisputed evidentiary record is fully consistent with TTI's reading of the Investors Rights Agreement

#### (a) The parties' intent

During discovery, EFH steadfastly insisted that its contractual intent, which it allegedly made known to TTI, was as follows: EFH's private equity owners wanted to exit their investment via a tax-efficient transaction; EFH could not predict in 2008 (when the IRA was executed) whether such a transaction would occur at the Oncor Holdings level, or elsewhere in the EFH/EFIH/Oncor Holdings corporate chain; EFH wanted to preserve its options to effect a transaction at any of those levels that would lead to a tax efficient exit. Their lead negotiator parroted this mantra *in haec verba* multiple times at his deposition.[10]

But even giving full credence to this alleged intent is of no avail to EFH. It now is undeniable that EFH has accomplished everything it wanted. It has procured a tax efficient transaction that will, according to EFH and OV1, result in a payout to creditors of 100

---

[10] (See, e.g., Horton Dep. (Ex. 3) 89:6-90:21, 156:16-158:4.)

cents on the dollar. EFH and OV1 have conceded that this payout will be made *regardless* of whether or not TTI is forcibly dragged out of its investment because, at EFH's insistence, *the Transaction is not conditioned on the Drag being triggered.* (Baker Dep. (Ex. 2) 61:23-63:2; Horton Dep. (Ex. 3) 267:7-13.) OV1 thus entered into the Transaction with its eyes wide open to the possibility of being unable to drag TTI. Indeed, OV1 has already prepared an alternative plan to be implemented if EFH cannot drag TTI, and that alternative plan will also pay creditors 100 cents on the dollar. (Disclosure Statement (Ex. 8) at 107; accord EFH Merger Agreement (Ex. 9) § 1.6, at 7; Exhibit WKB-7 — Purchasers' Narrative Statement Concerning Minority Interest Acquisition Contingency Plans, at 4, In re: Control No. 45188 (Pub. Util. Comm. Tex. Oct. 15, 2015) (Docket No. 105) (Ex. 10) at 4-9.) Accordingly, this Court need not adopt EFH's strained reading of §3.3 in order to effectuate its alleged contractual intent of a tax efficient exit scenario.

*Per contra*, EFH's reading would directly contradict TTI's contractual intent, which EFH admits it was aware of. Specifically, EFH was told by TTI that it, too, wanted to be dragged only in a transaction that was tax efficient from its perspective. (Horton Dep. (Ex. 3) 88:4-25, 160:7-161:7.) Yet dragging TTI in the Transaction *will* trigger a substantial tax liability for TTI. (See Zucchet Dep. (Ex. 5) 338:20-339:23.) Therefore, EFH's reading effectuates only *its* tax agenda and directly frustrates TTI's. In contrast, TTI's reading, which is consistent with the plain meaning of the IRA as a whole, effectuates *both parties' mutually expressed* tax agendas.

(b)    The drafting history

The various iterations of the IRA further cements TTI's position. EFH's original Term Sheet contained a narrow "Tag" Provision, limiting the circumstances under which

8

TTI could tag along with a potential sale transaction.  TTI made numerous changes to EFH's proposal by inserting the defined term "Transfer" to trigger the Tag in the event of a *"sale or other Transfer"* of LLC Units – a change which EFH admittedly understood was intended to *broaden* the scope of the Tag beyond a "sale."  (Horton Dep. (Ex. 3) 116:13-117:7; Wilks Dep. (Ex. 4) 240:24-241:12.)  Notably, the Tag is also triggered "in the event that EFH . . . proposes to Transfer LLC Units . . . indirectly, through a Transfer of equity interests in a Subsidiary of EFH the sole or principal asset of which is such LLC Units[.]" (IRA (Ex. 1) § 3.2(h).)

This evidence is conclusive.  There is no question that the parties knew how to address indirect transfers of assets, such as Oncor LLC Units, through transactions up the corporate chain when they intended to do so.  It is undisputed that EFH did not seek to add to the Drag provision this same clear "Transfer" language appearing in the Tag provision (See Horton Dep. (Ex. 3) 151:5-155:12), and it is undeniable that it did *not* make its way into the Drag provision to broaden the drag trigger beyond a "purchase" of LLC Units. Under the controlling Supreme Court precedent, where words or phrases are used in certain portions of a contract and not in others, one should interpret the portions lacking those words or phrases differently from the ones including them.  See Gustafson v. Alloyd Co., 513 U.S. 561, 567-69 (1995).

*          *          *

In the final analysis, both the plain meaning of Section 3.3 and the evidentiary record amassed during expedited discovery point ineluctably to the same conclusion: TTI's interpretation of the Drag is the only interpretation that effectuates the mutual intentions of *both* parties for a tax efficient transaction, whereas plaintiffs' interpretation effectuates only *its own* tax agenda but is otherwise unmoored from the plain language of

9

the contract and the evidentiary record; TTI's interpretation of the Drag reconciles all the relevant IRA provisions, without the need to have one provision "trump" another based on the unilateral whims of one of the parties, as EFH's strained interpretation would do; and TTI's interpretation of the Drag confirms the drafting history, which conclusively shows that the Tag provision was intentionally **_broadened_** by adding language that was noticeably not added to the Drag provision.

Based on the plain language of the IRA, the undisputed evidence of the parties' contract intent and the drafting history of the IRA, this Court should enter proposed findings of fact and conclusions of law granting summary judgment to TTI.

## UNDISPUTED FACTS

### A.    Oncor's Ownership Structure

Non-debtor Oncor Electric Delivery Company LLC ("Oncor") is a rate-regulated transmission and distribution utility operating in Texas.[11]    Oncor Members' ownership interests in Oncor are represented by "LLC Units." (IRA (Ex. 1) § 2.1(b).) Defendant TTI directly owns 19.75% of Oncor's LLC Units. (See Oncor Electric Delivery Company LLC, Annual Report (Form 10-K) (Feb. 27, 2015) (the "Oncor Form 10K") (Ex. 1) at 1.) Plaintiff EFH owns 100% of EFIH, which, in turn, wholly owns Oncor Holdings. (Id. at 19.)

Oncor Holdings, an entity within the "ring fence," directly owns 80.03% of Oncor's LLC Units and is managed by an independent board of directors. (See Amended and

---

[11]    (See Disclosure Statement for the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code, at 3-4, In re Energy Future Holdings Corp., No. 14-10979 (Bankr. D. Del. Sept. 21, 2015) (Docket No. 6124) (hereafter, the "Disclosure Statement"), Ex. 8.)

Restated Ltd. Liab. Co. Agreement of Oncor Holdings (Ex. 13) § 10(a).) The remaining

0.22% equity interest in Oncor is indirectly owned by Oncor Management. (Oncor Form

10K (Ex. 12) at 19.) A simplified corporate structure chart is shown below:



Oncor and Oncor Holdings are "ring-fenced" from the debtors in EFH's Chapter 11

cases. (Oncor Form 10K (Ex. 12) at 19.)

### B.    Oncor's Investor Rights Agreement

The centerpiece of this dispute is the IRA, entered into as of November 5, 2008, by

Plaintiff EFH, Oncor Holdings (the "Initial Member"), TTI (the "Minority Member") and

Oncor (the "Company"). (IRA (Ex. 1) at 1.) The IRA contains an integration clause

providing that the final agreements entered into between the parties "constitute the entire

agreement of the Company and the Members in their capacity as members of the Company

and their Affiliates relating to the subject matter contained herein and supersedes all prior

Contracts or agreements with respect thereto, whether oral or written." (IRA (Ex. 1) §

5.2.)

11

### 1.    The Negotiations Leading up to the Execution of the IRA

Even before the first draft of the IRA was shared with potential investors, EFH and

Oncor provided a term sheet (the "Term Sheet") listing their expectations concerning a tax

efficient IPO, drag-along rights and tag-along rights:

> **Exchange Rights:** In the event of an IPO or other sale of equity interests of
> Oncor Holdings, Intermediate Holding Company or any other entity that
> would directly or indirectly hold a membership interest in Oncor following a
> restructuring to permit a tax efficient IPO or sale (each, a "Transacting
> Party"), subsequent to the restructuring, Equity Investor will be entitled to
> exchange its membership interests in Oncor for a like amount of equity
> interests in the Transacting Party.
>
> **Tag-Along** - Prior to a Qualified IPO of Oncor (or an applicable successor or
> a Transacting Party), Equity Investor will be entitled to pro rata tag-along
> rights in connection with sales of equity interests in Oncor (or an applicable
> successor or a Transacting Party) to non-affiliates.
>
> **Drag-Along Rights** - Prior to the date that is 18 months following a Qualified
> IPO of Oncor (or an applicable successor or a Transacting Party), if EFH
> Corp. or a Transacting Party proposes to sell equity interests in a single
> transaction that would constitute a transfer of greater than 50% (taking into
> account all equity interests being "dragged") of the outstanding equity
> interests of Oncor (or an applicable successor) or a Transacting Party, EFH
> Corp. or such selling Transacting Party, as applicable, will be permitted to
> drag-along Equity Investor in the same proportion as the proposed sale by
> EFH Corp. or such selling Transacting Party. If appropriate, the portion of
> Equity Investor's membership interests in Oncor being "dragged" will be
> exchanged for equity interests in the Transacting Party whose equity interests
> are being sold immediately prior to such sale.

(See Indicative Bid Instructions to Borealis (the "Bid Instructions" (Ex. 15) Ex. A).)

From the very first Term Sheet, potential investors were told that if there were a

restructuring to permit a "tax efficient" IPO or sale transaction through a "Transacting

Party," potential investors (the "Equity Investor") could participate in any IPO of such

"Transacting Party" by exchanging "membership interests in Oncor for a like amount of

equity interests" in the IPO vehicle. (Indicative Bid Instructions (Ex. 15) Ex. A.) Potential

investors were also informed that if a transaction was proposed that would constitute a

12

change of control of "Oncor (or an applicable successor) or a Transacting Party," they could be subject to drag-along rights.  (Bid Instructions (Ex. 15) Ex. A.)

### 2. Any "IPO Conversion" Approved by Oncor's Board Requires Granting TTI the Right To Receive Shares in the "IPO Corporation"

The executed IRA contained provisions governing steps Oncor's Board may take to IPO an "IPO Corporation."  (IRA (Ex. 1) § 3.7.)  The term "IPO Conversion" is expressly defined as actions taken by Oncor's Board to create or prepare a suitable vehicle (defined in the IRA as an "IPO Corporation") "for the express purpose of an initial public offering of securities of such IPO Corporation for sale to the public in an IPO."  (IRA (Ex. 1) § 3.7(a).)  Section 3.7 provides that Oncor and each Member must cooperate with any actions taken by Oncor's Board for that purpose.  (IRA (Ex. 1) § 3.7(a).)

In connection with any "IPO Conversion" as defined in the IRA, however, Oncor and each Member must "ensure that each Member receives shares of common stock (or other equity securities) or the right to receive shares of common stock (or other equity securities), and other rights in connection with such IPO Conversion substantially equivalent to, and in exchange for, its economic interest, governance, priority and other rights and privileges as such Member had with respect to its [Oncor] LLC Units prior to such IPO Conversion."  (IRA (Ex. 1) § 3.7(a).)  Equity interests in the IPO Corporation are "IPO Units," which are what TTI would receive if it chose to exchange its LLC Units pursuant to an IPO Conversion.  (IRA (Ex. 1) § 3.7(a).)

### 3. The IRA's Drag-Along Provision

Section 3.3(a) of the IRA contemplates offers being made at two different levels that may trigger the Drag.  Section 3.3(a)(ii) applies to offers received by Oncor Holdings, referred to as an "Initial Member Sale Proposal."  (IRA (Ex. 1) § 3.3(a)(ii).)  Section

13

3.3(a)(i), by contrast, applies to offers received by EFH, and other entities "above" the ring-fence, referred to as an "EFH Sale Proposal." (IRA (Ex. 1) § 3.3(a)(i).)

Both an "Initial Member Sale Proposal" and an "EFH Sale Proposal" require: (1) an offer to purchase Oncor "LLC Units" or "IPO Units," as applicable, including such units belonging to TTI that (2) would result in a "Change of Control." (IRA (Ex. 1) § 3.3(a).) If EFH receives such a proposal, it may send a "Required Sale Notice" to TTI, requiring TTI to sell or otherwise transfer the same proportion of its own "Drag Units" (*i.e.*, Oncor LLC Units or IPO Units) to the proposed transferee. Section 3.3(a), in full, provides as follows:

> Notwithstanding anything contained in this Article III to the contrary, but subject to Section 3.3(f), *if* (i) Parent,[12] *EFH* or its Subsidiaries (other than the Initial Member (or its Permitted Transferee(s)) *receives an offer to purchase* (an "EFH Sale Proposal") *a number of LLC Units or IPO Units, as the case may be,* held directly or indirectly by such entities and LLC Units or IPO Units, as the case may be, owned directly by Members other than the Initial Member (or its Permitted Transferee(s)) (the "EFH Drag Units") or (ii) if the Initial Member (or its Permitted Transferee(s)) receives an offer to purchase (an "Initial Member Sale Proposal") a number of LLC Units or IPO Units, as the case may be, including LLC Units or IPO Units, as the case may be, owned by Members other than the Initial Member (or its Permitted Transferee(s)) (the "Initial Member Drag Units" and together with the EFH Drag Units, the "Drag Units") *such that the transaction would result in a Change of Control* (taking into account all LLC Units or IPO Units being "dragged") (each, a "Required Sale"), then EFH or the Initial Member (on its own behalf or on behalf of its Permitted Transferee(s)), as the case may be, may deliver a written notice (a "Required Sale Notice") with respect to such EFH Sale Proposal or Initial Member Sale Proposal at least twenty (20) Business Days prior to the anticipated closing date of such Required Sale to all Members (other than the Initial Member (or its Permitted Transferee(s))) requiring them to sell or otherwise Transfer their Drag Units to the proposed transferee in accordance with the provisions of this Section 3.3.

(IRA (Ex. 1) § 3.3(a) (emphases added).)

As used in the IRA, "Change of Control" means:

---

[12] "Parent" means Texas Energy Future Holdings Limited Partnership and any successor entity. (IRA (Ex. 1) at 39.)

(i) the sale of all or substantially all of the assets of the Company [Oncor] or the IPO Corporation, as the case may be, to any Person (or group of Persons acting in concert), other than to a Related Entity or its Affiliates; or (ii) a merger, recapitalization or other sale by [Oncor] or the IPO Corporation, as the case may be, or a Related Entity[13] or any of its Affiliates, to a Person (or group of Persons acting in concert) of equity interests that *results in any Person* (or group of Persons acting in concert) *owning more of the equity interests of the Company* [Oncor] (or any resulting entity after a merger) *than the relevant Related Entity* and its Affiliates.

(IRA (Ex. 1) at 40 (emphases added).)   The IRA also requires that the Members, Oncor Holdings and TTI, be treated equally in all respects in any drag-along sale:

The obligations of the Members pursuant to this Section 3.3 are subject to the following conditions:  (i) subject to Section 3.3(f), *each of the Members shall receive the same type and amount of consideration* (except in the case of a Required Sale in which the consideration received by the sellers or transferors consists of both cash and securities, to the extent that any Members other than the Minority Member and its Permitted Transferees agree to accept a disproportionate share of securities in order to allocate a greater portion of cash to the Minority Member and/or its Permitted Transferees due to restrictions described in clause (ii) immediately below on the ability of the Minority Member and/or its Permitted Transferees to hold such securities), *at the same time, on a per Drag Unit basis*, and shall participate in such Required Sale *on terms and conditions no less favorable in the aggregate than those offered to the other Members*.

(IRA (Ex. 1) § 3.3(d)(i) (emphases added).)

In the event a Required Sale (i.e., an offer to purchase "Drag Units") is "conditional upon or includes the sale by Parent [Texas Energy Future Holdings Limited Partnership] or its Subsidiaries of any of their material assets (*other than the Drag Units*)," section 3.3(f) of the IRA provides for an appraisal process to "determine the fair allocation of purchase price as to the Drag Units and other such material assets."   (IRA  (Ex. 1) § 3.3(f)(ii) (emphasis added).)

---

[13]  "'Related Entity' means the Initial Member [Oncor Holdings] or any current Affiliate of the Initial Member that directly holds a membership interest in the Company [Oncor] or the IPO Corporation following an IPO Conversion."  (IRA (Ex. 1) Ex. A.)

15

### 4.    TTI Negotiated To Broaden the IRA's Tag-Along Provision

The drafting history of the tag-along provision shows that TTI added the broad term "Transfer" throughout section 3.2(c) so that TTI would have the right to tag into not only sales of LLC Units or IPO Units ("Tag Units"), but "Transfers" of Tag Units – including "Transfers" effectuated through a sale of upstairs equity – a provision critically *absent* in the drag provision.[14]  (See Borealis/GIC April 14, 2008 Draft IRA (Ex. 17) §§ 3.2(c), 3.2(h).)

Specifically, Section 3.2(h) provides:

(h) In the event that EFH or any of its Subsidiaries proposes to Transfer LLC Units or IPO Units, as the case may be, indirectly through a Transfer of equity interests in a Subsidiary of EFH the sole or principal asset of which is such LLC Units or IPO Units […] and such Transfer would not trigger the issuance of an Inclusion Notice to the Tag Offerees pursuant to the terms of this Section 3.2, EFH or any of its Subsidiaries, as applicable, shall cause (i) an offer to be made to each Tag Offeree to Transfer a portion of its LLC Units or IPO Units, as the case may be, equal to the number of such securities that such Tag Offeree would have been permitted to Transfer pursuant to this Section 3.2 if the proposed Transfer had been effected as a direct Transfer by a Related Entity (the "Equivalent Offer") and (ii) the terms of the Equivalent Offer to be in all material respects substantially similar in the aggregate to those terms that would have been offered to each Tag Offeree pursuant to the terms of this Section 3.2 if the proposed Transfer had been effected as a direct Transfer by a Related Entity.

(IRA (Ex. 1) § 3.2(h).)

Neither the broad term "Transfer" nor a counterpart to Section 3.2(h) of the IRA were added by EFH to the drag-along provision of the IRA.  That provision may *only* be triggered by the "purchase" of LLC Units or IPO Units.  (IRA (Ex. 1) § 3.3(a).)

---

[14]    The IRA defines "Transfer" as "any direct or indirect transfer, sale, gift, assignment, exchange, mortgage, pledge, hypothecation, encumbrance or any other disposition (whether voluntary or involuntary, by operation of Law, pursuant to judicial process or otherwise) of any LLC Units (or any interest (pecuniary or otherwise) therein or rights thereto."  (IRA (Ex. 1) at. 41.)

### C.    The EFH Bankruptcy Plan and Merger Agreement

On August 10, 2015, EFH filed a third amended joint plan of reorganization (as subsequently amended, the "Plan")[15] and a disclosure statement for the Plan.  At a high level, the Plan contemplates two sets of transactions:  First, a deconsolidation or spin-off of reorganized Texas Competitive Holdings Company ("TCEH," an EFH subsidiary) with an intended tax treatment (the "T-side Spin") and, second, a merger whereby Ovation will merge Reorganized EFH into OV1 (the "EFH merger").  OV1, referred to as "New EFH," must be "taxed as a REIT within the meaning of section 856 of the [Internal Revenue Code]." (Disclosure Statement (Ex. 8) at 229.)

### 1.    The T-Side Spin

Prior to the EFH Merger, it is proposed that existing equity interests in EFH will be canceled and certain TCEH creditors will become the 100% equity owners of Reorganized EFH. (Disclosure Statement (Ex. 8) at 20-24.)  This step was structured intentionally so that the T-side Spin satisfies the "continuity of interest" requirements set forth in Treas. Reg. Sec. 1.368-1(d), which is one of the required IRS rulings in connection with the T-side Spin.  (Order Confirming Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al, Pursuant to Ch. 11 of the Bankruptcy Code, In re Energy Future Holdings Corp., No. 14-10979 (Bankr. D. Del. Dec. 6, 2015) (Docket No. 7244) (the "Confirmation Order") (Ex. 18) Ex. A. at  28 .)

### 2.    OV1's Merger with Reorganized EFH

On August 9, 2015, EFH and EFIH entered into a Purchase Agreement and

---

[15]  (See Exhibit A to Order Confirming Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al, Pursuant to Ch. 11 of the Bankruptcy Code, In re Energy Future Holdings Corp., No. 14-10979 (Bankr. D. Del. Dec. 6, 2015) (Docket No. 7244) (the "Confirmation Order") (Ex. 18).)

Agreement and Plan of Merger (the "EFH Merger Agreement") with OV1 and OV2. Pursuant to the EFH Merger Agreement, Reorganized EFH will merge into OV1, with OV1 surviving.[16] (EFH Merger Agreement (Ex. 9) at 4.)

In exchange for merging with Reorganized EFH, Ovation has arranged to pay cash to satisfy certain EFIH and EFH claims. (See EFH Merger Agreement (Ex. 9) § 1.4.) That payment, referred to in the EFH Merger Agreement as the "Repayment Amount," does not depend on whether TTI's Oncor LLC Units are dragged. (See id.)

Ovation's lead negotiator testified that EFH did not want the Transaction to be conditioned on a successful exercise of the Drag. (Baker Dep. (Ex. 2) 60:7-63:7.) Both EFH's confirmed Plan and the Disclosure Statement state unequivocally that whether TTI is dragged "shall not be a condition to Confirmation or Consummation" of the Plan. (Confirmation Order (Ex. 18) Ex. A at 70; see also Disclosure Statement (Ex. 8) at 107.)

### 3.    The REIT Conversion Steps

Exhibit B to the EFH Merger Agreement identified a series of steps designed to enable OV1 to qualify as a REIT and later sell its shares to the public. (EFH Merger Agreement (Ex. 9) Ex. B.) EFH and OV1 decided to call those steps an "IPO Conversion Plan." (Id.) On December 17, 2015, EFH sent a letter to Oncor notifying Oncor that the purported "IPO Conversion Plan" had been amended and superseded "in its entirety." (December 17, 2015 EFH Letter (Ex. 20) at 2.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[16] The proposed transaction has been deliberately structured as an investment in OV1 rather than as an offer to purchase Oncor Holdings' LLC Units. The purchase of Oncor Holdings' LLC Units, although it would indisputably trigger the drag right, would require EFH to realize its large negative basis in the Oncor partnership. (See Omnibus Tax Memorandum, In re Energy Future Holdings Corp., No. 14-10979 (Bankr. D. Del. Oct. 1, 2014) (Docket No. 2296) (Ex. 19) at 8 n.6.)



Moreover, although labelled as an "IPO Conversion Plan," neither EFH nor OV1 – the purported "IPO Corporation" – have taken steps to provide TTI with "shares of common stock (or other equity securities) or the right to receive shares of common stock" in OV1, as required for an "IPO Conversion" authorized by Oncor's Board.  (IRA (Ex. 1) § 3.7(a).)  To the contrary, OV1's most recent Form S-11 states that if they are unable to drag TTI under the current structure, they will "reduce the number of shares sold," and TTI "will continue to be a minority member of Oncor AssetCo."  (Ovation Acquisition I, Inc., Amendment No. 2 to Registration Statement (Form S-11) (Jan. 20, 2016) (the "Ovation Form S-11") (Ex. 22) at 5, 77.)

**D.    EFH's Purported "Required Sale Notice"**

On September 4, 2015, EFH sent TTI a letter styled as a "Required Sale Notice" asserting that OV1's form of offer letter appended to the EFH Merger Agreement (the "Offer Letter") triggered EFH's right to compel a sale by TTI of its minority equity interests in Oncor under § 3.3 of the IRA.  (Required Sale Notice (Ex. 23) at 1.)  On September 11, 2015, TTI responded, stating that TTI "has complied and will continue to comply with its contractual obligations under the [IRA]," but did not agree that any obligations under the drag or IPO Conversion sections of the IRA had been triggered. (Response Letter (Ex. 24) at 1.)

The Notice asserts that OV1 is the "IPO Corporation" as defined in the IRA.

(Rquired Sale Notice (Ex. 23) at 2.) OV1 is currently 100% owned by the same parties, prior to the consummation of the EFH merger, who will own the majority of OV1 after the EFH merger and the Rights Offering. (Baker Dep. (Ex. 2) 118:19-120:9, 126:9-127:7.)

With respect to Oncor, at no point in any of the transactions described above will Oncor Holdings, another Oncor Member, cease to own any of its Oncor LLC Units. (Baker Dep. (Ex. 2) at 67:16-68:4, 70:25-71:21, 77:11-21; Wilks Dep. (Ex. 4) at 185:18-22.) Oncor Holdings is not receiving any consideration under the EFH merger, nor will EFH be paying any taxes on account of money allocable to Oncor Holdings' LLC Units. (Horton Dep. (Ex. 3) at 259:12–260:1.) EFH will not take the position with the IRS that it has sold LLC Units. (See Energy Future Holdings Corp.'s Resps. & Objs. to Texas Transmission Investment LLC's First Set of Requests for Admission ("EFH RFA Response") (Ex. 14), No. 6.)

## ARGUMENT

## I.    LEGAL STANDARDS

### A.    Summary Judgment Should Be Entered Where There Is No Genuine Issue of Material Fact

Federal Rule of Civil Procedure 56, made applicable here by Bankruptcy Rule 7056, dictates that summary judgment be entered where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). A fact is "material" only if it can affect the outcome of the action. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Once the movant shows the absence of a genuine issue of material fact, the nonmoving party may not rest upon the allegations of its pleading, but must set forth specific facts that raise a genuine issue for trial. See Celotex v. Catrett, 477 U.S. 317, 324 (1986).

**B.    Summary Judgment Should Be Granted Where EFH's Evidence Is Insufficient To Prove an Essential Element of Its Claim**

Under New York law,[17] an action for breach of contract requires proof of "(1) formation of a contract between plaintiff and defendant; (2) performance by plaintiff; (3) defendant's failure to perform; and (4) resulting damage." Clearmont Prop., LLC v. Eisner, 872 N.Y.S.2d 725, 728 (App. Div. 2009).   Because EFH bears the burden of persuasion at trial, TTI may demonstrate its entitlement to summary judgment by showing that EFH's evidence is insufficient to prove an element of its claim. See Foulk v. Donjon Marine Co., 144 F.3d 252, 258 n.5 (3d Cir. 1998).

**C.    All Contractual Conditions for Exercising a Drag Right Must Be Satisfied**

Courts have refused to enforce drag rights unless all contractual prerequisites have been met to the letter. See, e.g., Halpin v. Riverstone Nat'l, Inc., C.A. No. 9796-VCG, 2015 WL 854724, at *9 (Del. Ch. Feb. 26, 2015) (on cross-motions for summary judgment, holding drag provision not implicated where "[t]he Company bargained for a right it did not exercise, and not the similar right it attempted to exercise"); Dawson v. Pittco Capital Partners, L.P., C.A. No. 3148-VCN, 2012 WL 1564805, at *20 (Del. Ch. Apr. 30, 2012) (granting declaratory judgment that drag provision had not been properly invoked).   Here, EFH's attempt to compel TTI to sell its Oncor equity interest violates both the spirit and the letter of the parties' contract, which protects TTI's investment in Oncor absent the occurrence of the specific events set forth in the IRA.

**D.    Because the IRA Is Unambiguous, a Purely Legal Question Is Presented**

It is well-settled under New York law that written agreements are construed in

---

[17]   The IRA is governed by New York law. (IRA (Ex. 1) § 5.6(a).)

accordance with the parties' intent, and "'[t]he best evidence of what parties to a written agreement intend is what they say in their writing.'" In re Energy Future Holdings Corp., 539 B.R. 723, 727 (Bankr. D. Del. 2015) (quoting Schron v. Troutman Sanders LLP, 986 N.E.2d 430, 433 (N.Y. 2013)). "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002); see also W.W.W. Assocs., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990) ("A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."). "'[C]ircumstances extrinsic to the agreement or varying interpretations of the contract provisions will not be considered, where . . . the intention of the parties can be gathered from the instrument itself.'" Maysek & Moran, Inc. v. S.G. Warburg & Co., 726 N.Y.S.2d 546, 546 (App. Div. 2001) (Mem.) (citations omitted).

Under New York law a "contract is not ambiguous simply because the parties have urged conflicting interpretations. Rather, a contractual provision is ambiguous only 'when it is reasonably susceptible to more than one reading.'" Reyes v. Metromedia Software, Inc., 840 F. Supp. 2d 752, 755 (S.D.N.Y. 2012);see also In re Energy Future Holdings Corp., 539 B.R. at 727 (on summary judgment, court "need not look 'outside the four corners' of a complete document to determine what the parties intended" (citing W.W.W. Assocs., Inc., 566 N.E.2d 639 at 642)).[18]

---

[18] Under New York law, the interpretation of an unambiguous contract is a "'matter of law for the court to decide.'" VKK Corp. v. Nat'l Football League, 244 F.3d 114, 129 (2d Cir. 2001) (citations omitted). Whether a contract provision is ambiguous is also a question of law for the court. See, e.g., Eternity Global Master Fund Ltd. v. Morgan

*(cont'd)*

22

E.    In the Alternative, If the Court Finds the Agreement
Ambiguous, Extrinsic Proofs, Including Industry
Custom, May Be Examined To Resolve the Ambiguity

As noted above, TTI believes that the IRA is unambiguous and capable of interpretation within its four corners.  However, in the alternative, if the Court nonetheless determines that the IRA is ambiguous, extrinsic evidence including industry custom and usage is admissible to resolve the ambiguity.  See, e.g., Reyes, 840 F. Supp. 2d at 755 ("If a court determines that a contractual provision is ambiguous, 'the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'"); Hoag v. Chancellor, Inc., 677 N.Y.S.2d 531, 535 (App. Div. 1998) (industry custom and usage admissible to "provid[e] guidelines for the unexplained term").

II.    NONE OF THE THREE REQUIREMENTS TO COMPEL
A DRAG SALE PURSUANT TO SECTION 3.3 OF THE
INVESTOR RIGHTS AGREEMENT HAS BEEN SATISFIED

Drag agreements requiring shareholders to sell equivalent securities upon receipt of a purchase offer providing identical terms (on an equivalent per-share basis) to each shareholder are common in privately held companies.  See In re Piece Goods Shops Co., 188 B.R. 778, 789 (Bankr. M.D.N.C. 1995); see also Memorandum Op. at *17-19, Fisher Scientific Int'l, Inc. v. Modrovich, No. H-03-0467 (S.D. Tex. Aug. 30, 2004) (Docket No. 163) (hereafter, "Fisher Scientific II") (noting that a contractual drag sale required the "same consideration . . . and the same terms and conditions" and holding that a purported sale notice "failed to comply with the Shareholders' Agreement, was invalid, and therefore

---

*(cont'd from previous page)*
Guar. Tr. Co. of N.Y., 375 F.3d 168, 178 (2d Cir. 2004) (citing W.W.W. Assocs., 566 N.E.2d at 642).

imposed no obligation" on shareholder); Memorandum Op. at *5, <u>Fisher Scientific Int'l,</u> <u>Inc. v. Modrovich</u>, No. H-03-0467 (S.D. Tex. Sept. 8, 2004) (Docket No. 46) (hereafter, "<u>Fisher Scientific I</u>").[19]  Against this backdrop, the parties negotiated a drag provision in the IRA that is triggered only upon the occurrence of specific conditions common to such provisions – including the requirement of a *purchase offer* and the requirement that shareholders receive identical consideration for their shares on identical terms.  Those prerequisites have not been met, and will not be met, under any construction of the facts in this case.

### A.    OV1 Has Not Made a Valid Offer To Purchase Oncor LLC Units or IPO Units from Each Member

A valid offer to purchase equity interests from each equityholder of a target company is the initial and most fundamental prerequisite to any drag sale, and is an expressly memorialized requirement of section 3.3(a) of the IRA.  Specifically, section 3.3(a)(i) of the IRA requires that EFH or its subsidiaries "receive[] an offer to purchase (an 'EFH Sale Proposal') a number of LLC Units or IPO Units, as the case may be, held directly or indirectly by such entities, and  LLC Units or IPO Units, as the case may be, owned directly by Members other than the Initial Member [Oncor Holdings]."  (IRA (Ex. 1) § 3.3(a).)  OV1's purported offer does not satisfy that fundamental requirement.

### 1.    OV1 Has Not Offered To Purchase IPO Units from EFH

While the Offer Letter purports to "represent[] an offer to purchase (i) substantially all of the IPO Units in the IPO Corporation" (Offer Letter attached to Required Sale Notice (Ex. 23) at 2), discovery has conclusively disproved that assertion.

---

[19]  Copies of the <u>Fisher Scientific I</u>  and <u>Fisher Scientific II</u> decisions are attached to the Transmittal Declaration of Jason Liberi as Exhibits 25 and 26, respectively.

According to OV1, the "IPO Corporation" is OV1 itself (see Offer Letter attached to Required Sale Notice (Ex. 23) at 2), and OV1 plainly has not offered to purchase its own equity (i.e., "IPO Units") from EFH.  Indeed, the description of the transactions in the Plan confirm that Reorganized EFH, which is merging into OV1, will never hold OV1 equity.  (See Confirmation Order (Ex. 18), Exhibit A at 70-71 (noting that EFH will merge out of existence in the proposed merger with OV1).)  EFH's treasurer, lead negotiator and designated 30(b)(6) witness Anthony Horton confirmed this at his deposition: "Q. EFH is never going to hold equity in OV I, is it?  A.  I don't believe so." (Horton Dep. (Ex. 3) 251:1-5.)  "Q.  EFH doesn't own any of that [OV1] equity and it's not going to sell any of that equity; is that correct?  A.  That's correct." (Id. at 276:9-12.)  Thus, regardless of whether any IPO Units will ever exist, OV1 has not offered to purchase any IPO Units and no "drag" may be predicated on any such offer.

### 2. OV1 Has Not Offered To Purchase LLC Units from EFH

The Offer Letter also states that it "represents an offer to purchase . . . alternatively, the acquisition of substantially all of the LLC Units in Oncor held indirectly by EFH" (Offer Letter attached to Required Sale Notice (Ex. 23) at 2), but that linguistically challenged assertion is similarly disproven by the record.

EFH and OV1 have repeatedly stated that OV1 will not purchase Oncor LLC Units held by anyone other than TTI or Oncor management, because doing so would trigger a significant tax liability.  (See EFH RFA Response (Ex. 14), Nos. 1, 2 & 6; Horton Dep. (Ex. 3) 276:25 – 277:19; Omnibus Tax Memorandum (Ex. 19), at 8 n.6.)

Instead, in the proposed EFH-OV1 merger, "[OV1] is buying all of the – effectively, buying all of the equity of EFH, which currently indirectly owns [a majority] of the LLC units of Oncor." (Horton Dep. (Ex. 3) 276:22-24.)  Plaintiffs appear to contend

that OV1's offer to merge with EFH in that manner is sufficiently analogous to the requisite "offer to purchase (an 'EFH Sale Proposal') a number of LLC Units or IPO Units, as the case may be, held directly or indirectly by such entities" (IRA (Ex. 1) § 3.3(a)) to potentially trigger a drag sale. (See Horton Dep. (Ex. 3) at 276:9-24; 312:11-314:8.) The IRA, however, expressly states that "*Transfers of LLC Units may only be made in strict compliance with all applicable terms of this Agreement and the LLC Agreement*" (IRA (Ex. 1) § 3.1(c) (emphasis added)). Under these circumstances, "close enough" does not suffice. See also Halpin, 2015 WL 854724, at *9 (holding drag provision not implicated where "[t]he Company bargained for a right it did not exercise, and not the similar right it attempted to exercise").

### (a)    An Offer To Merge with a Company Is Neither Semantically Nor Legally an Offer to Purchase Assets Held by That Company

Under plain English, an offer to merge with Reorganized EFH and acquire Reorganized EFIH stock, even if resulting in an indirect "acquisition" of Oncor Holdings equity and, by extension, Oncor Holdings' Oncor LLC Units, simply is not an offer to "purchase" Oncor LLC Units held by any entity – particularly where, as here, it is conceded that Oncor Holdings will continue to own its LLC Units. See, e.g., Ellington v. EMI Music, Inc., 21 N.E.3d 1000, 1003 (N.Y. 2014) ("The words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning."). And that is true not only as a matter of semantics, but also as a matter of law.

There is a crucial distinction between acquiring an entity and purchasing an entity's assets (the assets in this case being Oncor Holdings' Oncor LLC Units). As a matter of established corporate law, "a purchase of stock in a corporation . . . does not constitute the purchase of the corporate assets, just as a transfer of the stock of a corporation is not a

transfer of the property and assets of the corporation itself."   Engel v. Teleprompter Corp.,

703 F.2d at 131.  Indeed, it literally is hornbook law that

> The ownership by one corporation of all the shares of another corporation does not make the former the owner of the corporate property of the latter. The corporation owning such stock is as distinct from the corporation whose stock is so owned as the person is from the corporation of which he or she is the sole member.

Victoria A. Braucher, 6A Fletcher Cyclopedia of the Law of Corps. § 2843 (1997); accord

Advanced Video Techs., 103 F. Supp. 3d at 419 ("Epogy did not acquire any of AVC's

assets simply by purchasing 100% of its stock.  That is a well-settled proposition of

corporate law[.]"); Owl Fumigating Corp., 24 F.2d at 719 ("The general rule of law is well

settled that ownership alone, of capital stock in one corporation by another, does not . . .

render the stockholding company the owner of the property of the other.").  This well-

established law applies with full force to limited liability companies.  See Del. Code Ann.

Tit. 6 § 18-701; In re Opus E., 480 B.R. at 575.

Even construing the facts in the light most favorable to EFH, it is indisputable that

the transaction contemplated by the EFH Merger Agreement is the acquisition or purchase

by merger of shares of EFH.  As a matter of law, OV1's acquisition of such shares is not

the purchase of the underlying assets at issue – i.e., the Oncor LLC Units owned by EFH's

indirect subsidiary Oncor Holdings.  Therefore, Oncor Holdings' LLC Units are not being

purchased or sold for purposes of potentially triggering a drag right under Section 3.3 of

the IRA.

> **(b)**    **An Offer To Transfer LLC Units Indirectly by Acquiring Equity Interests in a Subsidiary of EFH the Sole or Principal Asset of Which Is Such LLC Units Is Not an Offer To Purchase LLC Units Held Indirectly by EFH**

The differing language between Section 3.3 of the IRA (addressing "drag-along" rights) and Section 3.2 (addressing "tag-along" rights) reinforces the conclusion above. As Robert Reilly, TTI's expert witness, has testified:

> It is common for financial advisors to describe business relationships as either vertical or horizontal. Vertical relationships involve a family of affiliated businesses that are arrayed in a parent-subsidiary structure. Conversely, where two businesses each directly invest in the equity of an enterprise, those two businesses share a horizontal relationship, as they are at the same level of ownership. . . .
>
> *In my experience, agreements allocating drag-along and tag-along rights and obligations among equity holders of a business usually apply to horizontal, and not vertical, business relationships – because the equity holders of that business are on the same level of ownership and the agreement concerns the rights and obligations attendant to that ownership relationship. . . .*
>
> *In my experience, if a drag-along or tag-along provision were intended to be triggered by the activities or separate transactions of a corporate parent to one of the equity holders, it would utilize language clearly announcing that fact.*

(Expert Report of Robert F. Reilly ("Reilly Report") (Ex. 27) ¶¶ 60, 61, 63 (emphases added).)

Here, the tag-along provision of the IRA (§ 3.2) contains language clearly announcing its application to vertical transactions involving a transfer of upstairs equity, while the drag-along provision (§ 3.3) does not. Specifically, Section 3.2(a) provides that TTI may voluntarily exit ("tag" out of) its Oncor investment at its election if Oncor Holdings or its affiliates "effect a sale or other Transfer of all or any number of LLC Units or IPO Units," with "Transfer" defined broadly as "any direct or indirect transfer, sale, gift, assignment, exchange, . . . or any other disposition (whether voluntary or involuntary, by

28

operation of Law, pursuant to judicial process or otherwise) of any LLC Units (or any interest (pecuniary or otherwise) therein or rights thereto)." (IRA (Ex. 1) § 3.2(a); Ex. A)

And even more specifically, § 3.2(h) provides that such a tag may be exercised in *vertical* transactions:

> In the event that ***EFH or any of its Subsidiaries*** proposes to Transfer LLC Units or IPO Units, as the case may be, ***indirectly through a Transfer of equity interests in a Subsidiary of EFH the sole or principal asset of which is such LLC Units or IPO Units*** . . . EFH or any of its subsidiaries, as applicable, shall cause (i) an offer to be made to each Tag Offeree [i.e., TTI] to Transfer a portion of its LLC Units or IPO Units, as the case may be, equal to the number of such securities that such Tag Offeree would have been permitted to Transfer pursuant to this Section 3.2 if the proposed Transfer had been effected as a direct Transfer by a Related Entity[.]

(IRA (Ex. 1) § 3.2(h) (emphases added).)

No such "clear[] announc[ement]" (Reilly Report (Ex. 27) ¶ 63) of a vertical transaction trigger involving upstairs equity exists in the IRA's drag-along provision. Instead, that section provides that EFH may force TTI out of its Oncor investment involuntarily *only* if, among other things, "Parent, EFH or its Subsidiaries . . . receives an offer to purchase (an 'EFH Sale Proposal') a number of LLC Units or IPO Units, as the case may be, held directly or indirectly by such entities[.]" (IRA (Ex. 1) § 3.3(a).) Critically, the drag provision requires an offer to "purchase" (rather than "Transfer") and contains no specific language about indirect Transfers of equity interests in a Subsidiary of EFH, the sole or principal asset of which is LLC Units. (Compare id. §§ 3.2(a), (h) with id. § 3.3(a).) The drag language is consistent with a traditional "horizontal" drag right and inconsistent with a "vertical" one. (See Reilly Report (Ex. 27) ¶¶ 60, 61, 63.)

Indeed, the *exclusion* of the broad word "Transfer" and express language of an indirect Transfer of equity interests in an EFH subsidiary in the drag provision while that language is included in the tag provision compels the conclusion – as a matter of law – that

a tag right may be triggered by an indirect Transfer of equity interests in an EFH subsidiary, while a drag right may not. See Quadrant Structured Prods. Co. v. Vertin, 16 N.E.3d 1165, 1172 (N.Y. 2014) ("[I]f parties to a contract omit terms . . . the inescapable conclusion is that the parties intended the omission. The maxim *expressio unius est exclusio alterius*, as used in the interpretation of contracts, supports precisely this conclusion." (Citations omitted.)); GPIF-I Equity Co. v. HDG Mansur Inv. Servs., Inc., No. 13 Civ. 547(CM), 2013 WL 3989041, at *3 (S.D.N.Y. Aug. 1, 2013) ("Under settled principles of contract construction – notably the presumptions of consistent usage and meaningful variation, which follow from the duty to construe the contract as a whole rather than in isolated provisions, see Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 567-69 (1995) – the parties' use of different language to describe the base off which the two types of fees would be calculated means that the 'aggregate amount of financing' is not the same thing as the 'aggregate gross purchase price.'" (Citations omitted.)).

Because EFH's Offer Letter proposes an indirect Transfer of equity interests in an EFH subsidiary, it is not an offer to purchase LLC Units sufficient to trigger drag rights under Section 3.3(a) of the IRA and the Court should enter proposed findings of fact and conclusions of law granting summary judgment to defendant TTI on the "drag" aspect of Plaintiffs' claim on that ground alone.

### B.    OV1 Has Not Offered Each Member the Same Type and Amount of Consideration

The "drag" aspect of Plaintiffs' breach of contract claim also fails because the Offer Letter does not provide for "each of the Members [to] receive the same type and amount of consideration . . ., at the same time, on a per Drag Unit basis, and [to] participate in such Required Sale on terms and conditions no less favorable in the aggregate than those offered

30

to the other Members," as is also required to exercise drag rights under the IRA. (IRA (Ex. 1) § 3.3(d)(i).)

It is now undisputed that Oncor "Initial Member" Oncor Holdings will not receive *any* consideration, let alone the same type and amount of consideration as TTI – precisely because it is not selling its LLC Units. (See EFH RFA Response (Ex. 14), Nos. 1 & 2; Horton Dep. at 277:13-19.) Nothing in the IRA permits a drag sale in such a scenario. See, e.g., Fisher Scientific II, Mem. Op. at 17-31 (defective sale notice "failed to comply with the Shareholders' Agreement, was invalid, and therefore imposed no obligation" on shareholder). Again, this result is perfectly consistent with the market understanding that a drag is limited to transactions among horizontal business partners absent clear language to the contrary (which is present in the tag provision here).

At the Motion To Dismiss stage, EFH's response was that it also is a "Member." (D.I.31 (Pl. Energy Future Holdings Corp.'s Mem. of Law In Opp. to Def. Texas Transmission Investment LLC's Mot. To Dismiss), at 15.) Even if true, OV1's offer still would fail to satisfy the requirement that "*each* of the Members" be offered qualifying consideration, since Oncor Holdings, which indisputably is a Member (IRA (Ex. 1) §3.3(d)(i)), is not receiving any consideration.

Moreover, construed as a whole (as it must be), the IRA conclusively shows that EFH is *not* a Member. The sole basis for EFH's assertion to the contrary is the Preamble to the IRA, which provides that:

> This INVESTOR RIGHTS AGREEMENT dated as of November 5, 2008 (this "Agreement"), is being entered into by and among Oncor Electric Delivery Company LLC, a Delaware limited liability company (the "Company"), Oncor Electric Delivery Holdings Company LLC, a Delaware limited liability company (the "Initial Member"), Texas Transmission Investment LLC, a Delaware limited liability company (the "Minority

31

Member"), Energy Future Holdings Corp., a Texas Corporation ("EFH") and any other Persons that may hereafter become a party hereto (collectively with the Initial Member and the Minority Member, the "Members").

(IRA (Ex. 1) at 1.)

Particularly considering that the IRA is the investor rights agreement of *Oncor* (a limited liability company in which EFH owns no membership units), TTI believes the most natural way to read that language is as defining the Members as Oncor's equityholders, i.e., "any other Persons that may hereafter become a party hereto (collectively with the Initial Member and the Minority Member, the 'Members').["20] EFH's contrary interpretation is based on the assertion that the lack of an "Oxford comma" between "('EFH')" and "any other Persons" is meaningful. Cf. Telenor Mobile Commc'ns v. Storm LLC, 587 F. Supp. 2d 594, 606 n.11 (S.D.N.Y. 2008) (noting that inclusion of final serial or "Oxford" comma is disfavored and interpreting individual components of a list separately). EFH's interpretation cannot prevail because it is contradicted by other portions of the IRA, and is unsupported by any record evidence. See, e.g., Greenfield, 780 N.E.2d at 173 (interpretation requires looking at contract as a whole).

First, the "Members; LLC Units" Section of the IRA provides that "[t]he Members shall have the rights and obligations conferred on Members pursuant to the LLC Agreement." (IRA (Ex. 1) § 2.1(b).) EFH is not a party to the LLC Agreement, however, and has no rights or obligations thereunder. (See generally Oncor LLC Agreement (Ex. 11); accord Horton Dep. (Ex. 3) 204:11-205:23.)

Second, the IRA provides that "[a] Member shall automatically cease to be a Member under this Agreement upon a direct Transfer of all such Member's LLC Units."

---

[20]  The only way to become a party to the IRA is by acquiring Oncor equity. (See IRA (Ex. 1) §§ 3.1, 3.4, 3.5.)

(IRA (Ex. 1) § 2.3.)  EFH does not own any Oncor LLC Units that could be "directly" transferred.  (See, e.g., Horton Dep. (Ex. 3) 205:14-23.)

Third, the IRA's definition of "Permitted Transferee" refers to "any Member *or* EFH" (IRA (Ex. 3) at 39 (emphasis added)), and in so doing plainly distinguishes between the Members and EFH.  The only way to make sense of the IRA as a whole, then, is if EFH is *not* a Member.

Moreover, § 3.7 of the IRA requires each "Member" to ensure that "each Member receives shares of common stock (or other equity securities) or the right to receive shares . . . and other rights in connection with [an] IPO Conversion substantially equivalent to, and in exchange for, its economic interest, governance, priority and other rights . . . as such Member had with respect to its LLC Units prior to such IPO Conversion[.]"  (IRA (Ex. 1) § 3.7(a).)  EFH has admitted that it has not complied with that "Member" obligation.  (See, e.g., Horton Dep. (Ex. 3) at 299:2-7 ("Q. And just to be clear, EFH is trying to drag TTI out of its Oncor investment before giving TTI an opportunity to exchange its Oncor LLC units for equity in the IPO corporation; isn't that correct?  A. I think – I think that is correct.").)  Respectfully, EFH cannot have its cake and eat it too.  Unless EFH intends to assert a *mea culpa* and admit it has materially breached the IRA (in which case it is barred from bringing a breach of contract claim), it cannot be a "Member" of the IRA only when it suits its purposes.

In all events, EFH admittedly is not receiving any consideration on a "per Drag Unit" basis.  The money it will receive is determined solely by the amount of claims that are allowed against the EFH estate and the amount of cash on hand.  (See Ovation's Irog. Responses (Ex. 7), No. 6 & Ex. B; Horton Dep. (Ex. 3) at 263:13-22.)  Further, EFH will

receive that money at the time of the proposed EFH-OV1 merger, which is scheduled to occur *after* the "Minority Buy Out." (See Confirmation Order (Ex. 18) Exhibit A at 70; see also Horton Dep. (Ex. 3) 266:24-267:6.) Nothing in the IRA permits EFH to drag TTI out of its Oncor investment before any other Member sells its stake; to the contrary, all "Members" must receive consideration "*at the same time.*" (See IRA (Ex. 1) § 3.3(d)(i) (emphasis added).) For this reason, too, the Court should enter proposed findings of fact and conclusions of law granting TTI summary judgment.

### C.    No Requisite "Change of Control" Will Occur

Before EFH may lawfully drag TTI's LLC Units, the underlying transaction must result in a "Change of Control." (IRA (Ex. 1) § 3.3(a)). Change of Control is specifically defined in the IRA:

> "Change of Control" means (i) the sale of all or substantially all of the assets of the Company or the IPO Corporation, as the case may be, to any Person (or group of Persons acting in concert), other than to a Related Entity or its Affiliates; or (ii) a merger, recapitalization or other sale by the Company or the IPO Corporation, as the case may be, or a Related Entity or any of its Affiliates, to a Person (or group of Persons acting in concert) of equity interests that results in any Person (or group of Persons acting in concert) owning more of the equity interests of the Company (or any resulting entity after a merger) than the relevant Related Entity and its Affiliates.

(Id. Ex. A at 35.)

Although the definition is long, it easily is parsed to require a transaction resulting in a change in the majority ownership of at least one of the "Company," the "IPO Corporation," or "any resulting entity after a merger." The first step is therefore to identify each of those entities.

The "Company" is defined in the IRA as Oncor. (IRA (Ex. 1) at 1.)

The "IPO Corporation" is defined in Section 3.7(a) of the IRA as "a suitable vehicle for an offering." (IRA (Ex. 1) § 3.7(a).) Plaintiffs contend that, in that context of the

34

Transaction, the IPO Corporation is OV1:

> The proposed transactions include (i) the cancellation and retirement of the outstanding equity interests in EFH held by Parent pursuant to the Plan (which is part of a recapitalization); (ii) the issuance and sale by **OV1, which is the IPO Corporation**, of OV1 Common Stock; (iii) the merger of reorganized EFH with and into **OV1 (the IPO Corporation)**; and (iv) the purchase of TTI's LLC Units.

(D.I.31, supra, at 16 (emphasis added).)

That very same passage also confirms that the "resulting entity after a merger" will, again, be OV1. (Id.)

Thus, a Change of Control requires a transaction resulting in a change in the majority ownership of either Oncor or OV1.

Under the Transaction, the majority owner of Oncor will remain Oncor Holdings, which will continue to hold at least 80.03% of the Oncor LLC Units. (E.g., EFH RFA Response (Ex. 14) No. 1 (admitting that "Oncor Electric Delivery Holdings Company LLC will continue to own substantially the same number of Oncor LLC Units (or more) after the closing of the proposed merger of OV1 and Reorganized EFH as it currently owns").)

The only potentially relevant question therefore is whether OV1 will experience a majority change in ownership. Plaintiffs well understand this point, as they last year avoided TTI's motion to dismiss by pointing to unnamed "new buyers" that supposedly would own the entity. (D.I.31, supra, at 17.) We now know that argument was wrong, as Ovation admitted in discovery that the very same persons that currently own OV1 will continue to own the entity after the transactions are concluded. (See Ovation's Irog. Responses (Ex. 7) No. 3 (listing creditors who presently own, and will continue to own, OV1); accord Baker Dep. (Ex. 2) 64:21-65:1 (OV1 was "formed by Hunt [and] is presently owned by a group of equity consortium members"); id. 132:16-134:2 (describing exhibit

showing the organization before and after the consummation of the merger, with the "after" depiction showing ownership by "the same Hunt consortium"); id. 141:7-13 ("Does that mean when the rights offering is complete, it's expected that the [current] equity investors will own 98 percent of OV I and the continuing stakeholders, TCEH unsecured creditors, will own about 2 percent of OV I? A. Post the -- post the rights offering and the merger, that's correct, yes.").

Because there is no change in the majority ownership of either Oncor or OV1, no Change of Control will occur as defined in the IRA and therefore no drag can occur.

## III.    TTI HAS NO DUTY TO COOPERATE WITH OV1'S PROPOSED IPO, BUT HAS DONE NOTHING TO INTERFERE WITH IT

In the Complaint, Plaintiffs allude to a "cooperation" clause in the IRA, and then worry aloud that "TTI may attempt to frustrate the sale of Oncor to [Ovation] by refusing to cooperate with the IPO Conversion Plan[.]" (D.I.1 (Compl. ¶¶ 39, 46).)  There is no dispute that the IRA includes a "cooperation" clause, but Plaintiffs' Complaint assiduously avoided quoting its actual language, which requires the Members to: (a) cooperate with such steps as "the **Board** [of Oncor] . . . deems necessary, advisable or convenient to create a suitable vehicle for an offering (the resulting entity, the 'IPO Corporation'), in each case for the express purpose of an initial offering of the securities of such IPO Corporation for sale to the public in an IPO (any such action, an 'IPO Conversion')"; and (b) cooperate to ensure that All Members are permitted to share in the IPO, by obtaining shares of the IPO Company:

> [Oncor] and each Member agree to cooperate with the other Members in good faith in order to effectuate the IPO Conversion ... and *ensure that each Member receives shares of common stock (or other equity securities) or the right to receive shares of common stock (or other equity securities)*, and other rights in connection with such IPO Conversion substantially equivalent to, and in exchange for, its economic interest, governance, priority and other

rights, and privileges as such Member had with respect to its LLC Units prior
to such IPO Conversion … and to ensure that such rights and privileges are
reflected in the organizational and other documents of the IPO Corporation….

(IRA (Ex. 1) §3.7(a) (emphases added).)

Plaintiffs have proffered no evidence that TTI has failed to act in good faith, or

acted in any way to otherwise jeopardize the ability of all Members to share equally in any

IPO. It also is undisputed that Oncor's Board, which all parties agree is not controlled by

TTI, has not, and will not, take any of the steps required to trigger an IPO Conversion (and

TTI's alleged duty to cooperate) until such time as the PUC rules. (See e-mail among

Patricia Villareal, et al, dated Feb. 3, 2016 (Ex. 21); Baker Dep. (Ex. 2) 151:17-152:4.) As

discovery has raised no material fact to the contrary, the Court should recommend that

Plaintiffs' claim on this score be dismissed.

## IV. EFH'S MISREADING OF THE INVESTOR RIGHTS AGREEMENT FRUSTRATES, RATHER THAN ADVANCES, THE PARTIES' REASONABLE EXPECTATIONS

EFH complains *ad nauseum* that not allowing it to drag TTI's shares would

frustrate the parties' intention to allow it to accomplish a tax-efficient, price maximizing

transaction. That is simply false. The parties' <u>shared</u> intent is clear from the face of the

agreement and the discovery record, and enforcing it does not require or even support a

drag of TTI's LLC Units.

It is important to remember that nothing that TTI now does will inhibit EFH's rights

in any way, because EFH will receive the same price, and the Plan can go forward,

whether TTI's LLC Units are dragged or not. As Plaintiffs repeatedly state:

For the avoidance of doubt, implementation and/or consummation of the
Minority Buy-Out shall not be a condition to Confirmation or

Consummation.[21]

EFH's equitable plea for help is therefore wholly misplaced.

In fact, despite EFH's protests, it is TTI's rights that are being frustrated if its LLC Units are dragged. As noted above, the "lead" negotiator for EFH (Horton Dep. (Ex. 3) 64:24-65:7), testified that *both* parties were highly conscious of their respective tax situations, and aimed during the negotiations to provide *both* parties the contractual leeway to structure an exit transaction in the most tax efficient manner possible. Those efforts included specific discussions of a REIT/IPO (id. 87:13-88:25), and the IRA therefore was drafted to allow *both* parties to participate. From EFH's initial Term Sheet, through to the executed IRA, it was clear that TTI would be permitted to participate in any IPO/REIT by exchanging its LLC Units for shares of the IPO vehicle, even if its IPO Units could later be dragged. (Supra pp. 8-9; IRA (Ex. 1) § 3.7.)

But if EFH now has its way and drags TTI out before the IPO, TTI will be unable to participate in the tax efficient, price maximizing IPO/REIT, contrary to its bargained-for rights. Indeed, if EFH's reading of the agreement is accepted, i.e., that an IPO can trigger the drag right, then there is no meaningful right for TTI to participate in an IPO – essentially reading that provision out of the contract unless EFH charitably chooses to allow TTI to participate. Any such reading that places one party to an agreement at the mercy of the whims of the other is contrary to law. "It is a longstanding principle of New York law that a construction of a contract that would give one party an unfair and unreasonable advantage over the other, or that would place one party at the mercy of the other, should, if at all possible, be avoided." ERC 16W Ltd. Partnership v Xanadu Mezz

---

[21]  (Disclosure Statement (Ex. 8) at 107.)

Holdings LLC, 943 N.Y.S.2d 493, 498 (App. Div. 2012).

Furthermore, while Plaintiffs consistenty portray TTI as the greedy party seeking to squeeze more money out of the Transaction, the shoe fits squarely on the other foot.

It is no accident that OV1 is driving this litigation train: EFH has done its job – it has procured the tax efficient exit scenario that its hedge fund owners yearned for; and achieved a 100 cents on the dollar recovery for its E-Side creditors. It has nothing to complain about.

Similarly, through the cleverly designed REIT structure that was the brainchild of OV1's architect of the Transaction, OV1 stands to gain a windfall. It is undisputed that the REIT value of OV1 far exceeds the current value of EFH. As OV1 will not pay EFH a penny more than the allowed claims amount, it will capture all of that excess value. Furthermore, despite the PUC staff's virulent objections, OV1 steadfastly has refused to share any of that excess value with the public ratepayers. But, apparently, even that is not enough. Through this litigation, OV1 seeks to squeeze a little more, by improperly dragging TTI in contravention of its rights under IRA § 3.7.

To be clear, TTI does not begrudge OV1's extraordinarily opportunistic agenda. But given these circumstances, it ill behooves OV1 to play the "greed" card against TTI. TTI bargained for specific conditions in the IRA and cannot be required to sell its Oncor units involuntarily unless all of those conditions are satisfied.

## CONCLUSION

For the foregoing reasons, TTI's motion for summary judgment should be granted in all respects.

Dated:     Wilmington, Delaware
           February 13, 2016

/s/     *Jason M. Liberi*
Jason M. Liberi (I.D. No. 4425)
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Tel.:  (302) 651-3000
Fax:  (302) 651-3001

- and -

George N. Panagakis (admitted *pro hac vice*)
Carl T. Tullson (admitted *pro hac vice*)
155 North Wacker Drive
Chicago, Illinois 60606
Tel.: (312) 407-0700
Fax: (312) 407-0411

- and -

George A. Zimmerman (admitted *pro hac vice*)
Jason C. Vigna (admitted *pro hac vice*)
Four Times Square
New York, New York 10036
Tel.: (212) 735-3000
Fax: (202) 735-2000

*Attorneys for Defendant Texas Transmission
Investment LLC*